**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHARLAYNE D. FOWLER** | : | |
| 3721 Halloway Place | : | |
| Upper Marlboro, MD  20772 | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION FILE NO.** |
| v. | : | (Jury Trial Demanded) |
| | : | |
| **GREENHOOT, INC.,** | : | |
| 7811 Montrose Road, Suite 500 | : | |
| Potomac, MD  20785 | : | |
| | : | |
| Serve:  Registered Agent | : | |
| GDL Agent, Inc. | : | |
| 1620 L Street, N.W. | : | |
| Washington, D.C.  20036 | : | |
| | : | |
| **WILLCO CONSTRUCTION CO., INC.** | : | |
| 7811 Montrose Road, Suite 200 | : | |
| Potomac, MD  20785 | : | |
| | : | |
| Serve:  Registered Agent | : | |
| GYFB, Inc. | : | |
| 1200 New Hampshire Avenue | : | |
| Suite 555 | : | |
| Washington, D.C.  20036 | : | |
| | : | |
| **DONALD PHEASANT, individually** | : | |
| 7406 Stubbs Bridge Road | : | |
| Spotsylvania, VA  22551 | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## COMPLAINT

Plaintiff, Charlayne Fowler ("Ms. Fowler" or "Plaintiff"), by and through her

undersigned counsel, hereby brings the instant Complaint against Defendants, by averring as

follows:

## INTRODUCTION

1.      This is an action by a former contract private security officer who performed services at 1772 I Street, N.W. in the District of Columbia, and addresses illegal discrimination, harassment and retaliation arising under 42 U.S.C. §1981 ("§1981"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*, ("Title VII"); the District of Columbia Human Rights Act, D.C. CODE §2-1401.01 *et seq*. ("DCHRA"), as well as a common law claim for tortious interference.

2.      These claims and the facts which support them are referred to individually or, at times, collectively as the "Lawsuit."

## PARTIES

3.      Ms. Fowler is an African American female and adult resident of the State of Maryland, whose address is 3721 Halloway Place, Upper Marlboro, Maryland, 20772.  At all relevant times alleged in this Lawsuit, Ms. Fowler performed security services in the District of Columbia.

4.      Greenhoot, Inc. ("Greenhoot") is a company organized under the laws of the District of Columbia, with a principal place of business located at 7811 Montrose Road, Potomac, Maryland 20854.

5.      Greenhoot previously conducted business in both the District of Columbia and State of Maryland through a registered trade name known as Axent Realty Group ("Axent Realty"), a trade name which has since been cancelled in the District of Columbia on or about March 6, 2014.  Upon information and belief, this trade name has also lapsed or forfeited in the State of Maryland on or about March 19, 2015.

6.     Willco Construction Co., Inc. ("Willco") is a company organized under the laws of the state of Maryland with a principal place of business also located at the same location as Greenhoot at 7811 Montrose Road, Potomac, Maryland 20854.

7.     Willco is a company that provides property management services for over four million square feet of commercial office space in more than forty locations in the greater District of Columbia metropolitan area.  At all times relevant to this Lawsuit, Willco provided property management services at 1722 I Street in the District of Columbia, and holds out this property to the public as a major piece of Willco's commercial portfolio.

8.     Willco and Greenhoot operate, conduct business and are active entities in the District of Columbia and are therefore subject to the personal jurisdiction of this Court.  At all times relevant to this lawsuit, Willco and Greenhoot are or were part of a single integrated enterprise, and/or joint employers who shared the same physical office location, resources, oversight and, at times, held themselves out to the public at large as the "Willco Companies."  At all times relevant to this Lawsuit, Willco and Greenhoot were themselves independently subject to the provisions of Title VII, the DCHRA and §1981.

9.     Defendant Donald "Buck" Pheasant ("Mr. Pheasant") is a Caucasian adult male who, at all times relevant to this lawsuit was an employee of Willco/Greenhoot, serving in various capacities, including but not limited to Chief Engineer at 1722 I Street in the District of Columbia.

10.     Mr. Pheasant is individually liable for the acts and conduct alleged herein under the DCHRA, §1981 and the common law claim asserted herein.

## RELEVANT NON-PARTY

11.     Frontline Security Services, LLC ("Frontline") is a federal contractor or subcontractor that provides on-site security personnel for various federal facilities of the United

3

States government through a contract with the Federal Protective Service ("FPS"), a division or arm of the United States Department of Homeland Security ("DHS"), including 1722 I Street, N.W., in the District of Columbia.

## JURISDICTION AND VENUE

12.     This Court has original subject matter jurisdiction (federal question) over this Lawsuit pursuant to 28 U.S.C. §1331, 42 U.S.C. §2000e-5(f), and 42 U.S.C. §1981.   In addition, the District of Columbia statutory claims under the DCHRA and common law as set forth herein are so intertwined and related to the federal questions so as to form a part of the same case and controversy, thus vesting this Court with supplemental jurisdiction over these claims pursuant to 28 U.S.C.  §1367(a).

13.     Ms. Fowler filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Axent Realty (*i.e,* Willco/Greenhoot), alleging harassment and retaliation.  More than 180 days have elapsed since the filing of this charge.  All conditions precedent necessary to file this Lawsuit have been performed.

14.     Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. §1391(b)(2), as the unlawful practices alleged in this Lawsuit were committed within this District.

15.     This action is timely filed as to all claims.

## FACTS

16.     On or about November 22, 2013, Ms. Fowler became employed for Frontline as a Private Security Officer (hereinafter "PSO" or "Officer").

17.     At some point between February and March of 2014, Ms. Fowler was assigned to work full-time as an Officer at 1722 I Street in the District of Columbia, which housed various companies and federal agencies, including the U.S. Department of Veteran Affairs.

18.     As a federal contract Officer at this location, Ms. Fowler and other guards were charged with access control and security screening of entrants who came to the building, which involved checking identification, processing badges and other screening protocols and procedures required by FPS.

19.     In her position, Ms. Fowler and other officers were required to interact on a daily basis with Mr. Pheasant, who goes by the nickname "Buck."   Mr. Pheasant worked as the Chief Engineer for Willco/Greenhoot at 1722 I Street in the District of Columbia.

20.     As Chief Engineer of the entire building, Mr. Pheasant had control over what occurred in the building, and building employees, FPS contractors, officers and others effectively answered to him.

21.     Mr. Pheasant routinely conveyed to both building employees and contract officers that he was either in charge of building security, or otherwise simply above the purview of FPS procedures and protocols by virtue of his position of Chief Engineer.

22.     Mr. Pheasant routinely bypassed FPS security access control by pushing his visitors and guests past security officers and loudly boasting "they're with me," without adhering to the basic security protocols that were in place for all entrants to the building.

23.     When any FPS contract security officers, guards or others attempted to inform Mr. Pheasant that such individuals still needed to undergo screening protocols, he would scream "this is my damn building" and" none of my visitors will go through security screening," or words to that effect.   Upon information and belief, Mr. Pheasant's conduct was known to Willco/Greenhoot and/or investigators at FPS who received complaints about his practices.

24.     Consistent with his megalomaniacal worldview that the 1722 I Street building was his personal fiefdom, Mr. Pheasant routinely exploited, in a misogynistic manner, what he perceived to be the spoils of his authority by forcing and subjecting female FPS contract officers

and other females to unwelcome touching, hugging, caressing, and grabbing, along with inappropriate sexual and racial comments.

25.    The unwelcome touching and comments often took place when Mr. Pheasant was greeting the female officers as either they or he arrived for work.

26.    This daily ritual of squeezing and hugging the female officers was in stark contrast to the manner in which Mr. Pheasant typically greeted male officers, which was with a handshake and otherwise respectful demeanor.

27.    Mr. Pheasant made it well known to employees and contractors who worked at the building that he had a particular affinity for black women, and often remarked that he does not date white women.

28.    Mr. Pheasant routinely greeted black female employees and FPS contract officers by walking directly towards them while opening his arms and then pulling them in for a tight hug while proclaiming "I need my black love, chocolate love," or "I need my brown sugar."

29.    When Ms. Fowler began working at the 1722 I Street building, she was assigned to the preferred day-time schedule, which required her to be at work at 1:00pm in the afternoon and typically work a shift that lasted until 9:00 pm each day, Monday through Friday.

30.    As an attractive African-American female, Mr. Pheasant quickly took notice of Ms. Fowler and would try to 'talk her up' when she arrived at work each day.  Ms. Fowler initially brushed this off as innocent and assumed that Mr. Pheasant would take her obvious disinterest as a sign that he should stop and back off.

31.    However, this did not occur and within a month after Ms. Fowler began working Mr. Pheasant began approaching her in a manner that was far more personal than professional which included his bear hug greeting which was forced upon Ms. Fowler each time Mr. Pheasant

was working.  These hugs were long and given with great strength.  It was not an easy task to attempt to wriggle out of the hug.

32.     Ms. Fowler would arch her body away from his and would quickly pat or tap him on the back with her hands as she tightened up her body, in hopes that he would stop his advancing hug.

33.     Ms. Fowler would also greet him from afar, with the hope that he would not come up to her and hug her.  Initially, Ms. Fowler used these non-verbal cues hoping that it would be sufficient.  She did, however, share with others her discomfort and disgust of Mr. Pheasant's behavior.

34.     Over the ensuing days, weeks and months, Mr. Pheasant became more unabashedly aggressive towards Ms. Fowler and his hugs and touching became progressively more sexual, assaultive and inappropriate in nature.

35.     When Mr. Pheasant forcibly hugged Ms. Fowler, he used his considerable strength to pull her in a much closer physical proximity to him such that it would ensure that he had his body completely pressed up against hers.

36.     Mr. Pheasant, in fact, would often hold Ms. Fowler in this position for an elongated period.

37.     Mr. Pheasant has an imposing physical frame and is very strong, especially in comparison to Ms. Fowler.

38.     As time went on, Mr. Pheasant's daily advances became far more aggressive and were, beyond any reasonable doubt, overtly sexual in nature and clearly harassing based on her race and gender.

39.     For example, Mr. Pheasant added to the hugging routine by running his hands down to the small of Mr. Fowlers' back and then groping and caressing her buttocks.  At times,

he even moved his hands further south onto her legs.  Given the escalation of the sexual harassment and unwanted touching, Ms. Fowler had to verbally reprimand Mr. Pheasant and directed him to stop touching her.

40.     This continued unwanted touching was assaultive, demeaning and humiliating to Ms. Fowler and was done in an open space where it was witnessed by those who were working alongside her and persons entering or exiting the building. Mr. Pheasant also displayed similar sexually harassing behavior to other black female officers.

41.     Mr. Pheasant would typically respond to Ms. Fowler's protestations by laughing at her.  These incidents were also routinely witnessed by others, who themselves stated that they believed Mr. Pheasant's conduct to be sexual harassment.

42.     On one particular occasion, Mr. Pheasant walked up to Ms. Fowler while she was sitting at her post signing in visitors.

43.     Mr. Pheasant purposely moved his body in such close proximity to hers that his crotch was pressed against her shoulder.

44.     Mr. Pheasant then bent over to physically hug Ms. Fowler who attempted to push him away and told him to stop.

45.     Even though Ms. Fowler asked him to stop and pushed him away, Mr. Pheasant only became more demanding and told Ms. Fowler that he would not leave until she hugged him.

46.     Traumatized and completely embarrassed, Ms. Fowler was forced into yet another hug, which, as usual included the touching of her buttocks.  Once again, this incident was witnessed by Officer McCain, among others.

47.     On yet another occasion, Mr. Pheasant walked up behind Ms. Fowler and clutched her around the waist area and used his physicality to forcibly press his crotch into her buttocks.

8

48.     The incident was not only an assault but was outrageous and dangerous insofar as Ms. Fowler was wearing a loaded weapon near her mid-section where Mr. Pheasant was pawing her.

49.     Ms. Fowler turned, pushed him away and pleaded with him by saying "stop Buck you can't do that to me," or words to that effect.

50.     Mr. Pheasant further demeaned her by simply laughing at her pleas for him to stop his behavior.

51.     By the summer of 2014, Ms. Fowler was repeatedly telling Mr. Pheasant to stop his physical overtures and touching and she stated to him that what he was doing was "sexual harassment" and that it must stop.

52.     Mr. Pheasant's behavior was, in fact, so demeaning and inappropriate that Ms. Fowler and other employees and/or contract officers, for their own protection, discussed how they should handle his assaults given that their demands to him that he stop were unavailing.

53.     Officer McCain and Officer Vassar (a female) for example, participated in some of these conversations and concerted activity which took place in or around the end of June or July in 2014.

54.     Ms. Fowler and other female officers discussed standing up and refusing Mr. Pheasant's overtures and hugs and agreed that they would all be firm and rebuke his attempts to forcibly hug, caress or touch them any further.

55.     The officers even created a pre-planned dialogue of sorts that they would all attempt to use by telling Mr. Pheasant that "things must stay as business only" when he attempted to touch and force himself on them.

56.     It was further discussed and agreed amongst the officers that they would no longer stand for Mr. Pheasant attempting to use his authority by allowing his friends, visitors and guests to bypass access security and FPS protocols whenever he wanted.

57.     Finally, Officer Vassar, agreed that she would relay the message, or directive, to Mr. Pheasant that the workplace environment must be completely professional at all times, that for now on he was not to hug or touch anyone else, and that he must abide by security protocols for guests and visitors.

58.     This message, unfortunately, was not well received.

59.     For example, Mr. Pheasant reacted violently to the suggestion that his overtures were not welcome and that all of his visitors and guests would have to comply with security access protocols, screaming at one point that "this is my damn building."

60.     Due to Mr. Pheasant's stated refusal, upon information and belief, Charles Thompson ("Mr. Thompson") from FPS was notified of these repeated breaches of procedure.

61.     Mr. Pheasant also did not react well to the fact that all female officers were, *en masse*, acting in a concerted manner by rebuffing his unwanted touching, including his ongoing attempts to forcibly hug them.

62.     For her part, Ms. Fowler, once again, told Mr. Pheasant in no uncertain terms that she did not like his sexual harassment and asked him to stop.  This conversation was witnessed and overheard by Officer McAllister.

63.     Mr. Pheasant's tone, demeanor and behavior then began to change towards Ms. Fowler.

64.     In fact, as an immediate response to Ms. Fowler's protected activity and request that the sexual harassment stop, Mr. Pheasant turned to Officer McAllister with belligerence and anger and stated: "I'm going to get that bitch ass out of here."

65.     Another guard named William Adams, Jr. ("Officer Adams") also heard Mr.
Pheasant state that he wanted Ms. Fowler "out of his building and he would find a way to get her
out."

66.     Mr. Pheasant's remarks concerning Ms. Fowler in this regard were retaliatory and
indicated that he harbored a motivation and animus against her that he intended to punish her for
rejecting his sexual advances and complaining about his behavior.

67.     Mr. Pheasant soon began to make good on his well-publicized threats to retaliate
against Ms. Fowler, initially in ways that were juvenile and petty, but nevertheless affected the
terms and conditions of her employment in a tangible fashion.

68.     For example, in the ensuing weeks, Mr. Pheasant first pretended to ignore Ms.
Fowler altogether when addressing or greeting other officers, as if she simply was not present in
the building at all.

69.     Mr. Pheasant thereafter eventually and purposefully revoked Ms. Fowler's free
parking privilege in the building, causing her to incur significant daily and weekly parking
charges that had a meaningful impact on her earnings as a lowly paid hourly worker.

70.     On one occasion, Mr. Pheasant, who was the Chief Engineer, did not turn on the
building's heat at the location where Ms. Fowler was stationed when the building was very cold.
He would, in a later conversation with Officer McCain, admit that this was purposeful.

71.     In the fall of 2014, Mr. Pheasant escalated his retaliation and interfered with Ms.
Fowler's terms and conditions of employment by contacting Frontline and demanding that her
schedule be changed from daytime to graveyard.

72.     As a result of Mr. Pheasant's efforts, Ms. Fowler's schedule was changed.

73.     The transfer to the overnight schedule deprived her of her ability to have
secondary employment, and placed great stress on her physically and emotionally.

74.     The transfer from daytime to nighttime shifts also resulted in less hours for Ms.

Fowler and she was paid less per hour.  All of this resulted in economic harm and emotional

harm.

75.     In addition to these overt and retaliatory actions, Mr. Pheasant also routinely

referred to Mr. Fowler as "BITCH" or "that BITCH" to Officer McCain and others officers,

whom then reported this to Ms. Fowler.

76.     In or around September or October of 2014, Officer McCain was briefly on a

leave of absence due to personal issues, and happened to bump into Mr. Pheasant off-site while

he was a few blocks away from 1722 I Street.

77.     Mr. Pheasant and Officer McCain exchanged greetings, and Mr. Pheasant asked

him where he had been recently, as he had not see him at the building.

78.     During their discussion, Ms. Fowler's name came up.  Mr. Pheasant stated "I

want that bitch out of my building."

79.     Officer McCain responded by saying "Buck, stop that dude she's a good officer,

she just wants to do her job and that's it," or words to that effect.

80.     Mr. Pheasant responded by again stating that "I want that bitch out of my

building."

81.     Mr. Pheasant further remarked that he was going to call Maj. Sergio Poitevin

("Maj. Poitevin), and Leon Bryant ("Mr. Bryant"); Frontline's Area Manager and Director of

Operations, respectively, to ensure it happened.

82.     Officer McCain returned to work at 1722 I Street in or around the week of

October 27, 2014.  He quickly ascertained that things had not improved, and that despite his

conversation with Mr. Pheasant, Mr. Pheasant was continuing to mistreat and retaliate against

Ms. Fowler.

83.     Officer McCain personally witnessed that Ms. Fowler was breaking down crying and was stressed by the ongoing events.  Ms. Fowler, in fact, had suffering from depression and anxiety attributable to Mr. Pheasant's behavior since July of 2014, and was undergoing a course of medical treatment.

84.     Officer McCain, believing himself to have a good working relationship with Mr. Pheasant, offered again to speak with him personally on Ms. Fowler's behalf.

85.     Ms. Fowler gratefully agreed.

86.     Officer McCain thereafter spoke with Mr. Pheasant at loading dock at the building on 1722 I Street.

87.     During this conversation, Mr. Pheasant kept repeating his mantra that "I want that bitch out of here," referring to Ms. Fowler.

88.     Exasperated, Officer McCain at one point responded to Mr. Pheasant: "do you understand you do not call the shots here?  If a request from the Agency or the ATR comes down to the company, then yes.  There has to be a valid reason for that to happen. She's very well liked among the government employees upstairs."

89.     Undeterred, Mr. Pheasant stated "this is my building and she has to go."

90.     Mr. Pheasant then said: "if it wasn't for the other officers [in the building] then he would make sure she was cold in the winter and hot in the summer by adjusting the temperatures in the lobby."  Officer McCain was floored by this comment.

91.     Unfortunately, Officer McCain's meeting did not end Mr. Pheasant's ongoing attempts to force Ms. Fowler from 'his building'.

92.     In fact, in furtherance of his scheme to have Ms. Fowler removed from 'his building,' Mr. Pheasant, upon information and belief, followed through on his threat to use

13

Frontline to advance his stated objective and called Maj. Poitevin or other at Frontline on November 20, 2015.

93.     The very next day, on November 21, 2014, Ms. Fowler received a call from Maj. Poitevin to report to the Frontline's office.  When she arrived, Maj. Poitevin informed her that she was being placed on suspension as a result of accusations relayed to Frontline by Mr. Pheasant.

94.     Specifically, Mr. Pheasant reported to Frontline entirely false, slanderous and manufactured accusations that Ms. Fowler had been harassing tenants whom worked for the Department of the Treasury.

95.     Ms. Fowler explained that not only was the allegation false, that she was not even on duty when the alleged incident took place.  However, as a result of Mr. Pheasant's actions, Ms. Fowler was given a letter that she had, in fact, violated a "Harassment Policy," and was suspended.

96.     Ms. Fowler's suspension and removal from the building was met with shock and outrage by other officers, as well as business invitees at 1772 I Street.

97.     On November 24, 2014, Ms. Fowler went to the Equal Employment Opportunity Commission ("EEOC") concerning these events, was interviewed and went through the Agency's charge intake process.

98.     An EEOC charge was formally filed on or about December 31, 2014.

99.     Ms. Fowler was subsequently cleared of Mr. Pheasant's false and slanderous allegations which was used as a pretext to remove her from 'his building' in fulfillment of his constant threats of retaliation.

100.     Despite being cleared, Mr. Pheasant would not permit Ms. Fowler to be returned to the 1722 I Street location.

101.    Ms. Fowler was thereafter involuntarily transferred to a new primary location at 625 Indiana Avenue in the District of Columbia.

102.    The building at 625 Indiana Avenue is home to several federal agencies subject to security through FPS, including the United States Court of Appeals for Veterans Claims.

103.    The transfer to 625 Indiana Avenue was a demotion insofar as it resulted in Ms. Fowler being generally scheduled to work a part-time schedule of approximately 24 hours per week.

104.    The move to a part-time schedule was also qualifying event within the meaning of ERISA, and she was later involuntarily removed from Frontline's health care plan, which had devastating effects and eventually forced her to forego medical treatment, causing further harm to her health.

105.    Ms. Fowler had been an excellent performer and well liked among her peers and building occupants prior to her suspension, demotion and transfer to 625 Indiana Avenue, all of which was unlawfully caused by Mr. Pheasant and Willco/Greenhoot by vicarious extension.

## COUNT I

## DISCRIMINATION AND HARASSMENT
### 42 U.S.C. § 1981
### (All Defendants)

106.    Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

107.    Defendants intentionally violated 42 U.S.C. §1981 by discriminating against Ms. Fowler on the basis of her race/color (African American/Black) by taking actions that had the effect of interfering, performing and enjoying all benefits, privileges, terms and conditions of her

contractual relationship with Frontline, and specifically denying her the opportunity to work and perform in a building environment at 1772 I Street that was free of unlawful harassment.

108.     Defendants have intentionally discriminated against Ms. Fowler on the basis of her race/color in violation of 42 U.S.C. §1981 by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment and/or *quid pro quo harassment* that included, among other things, severe and pervasive harassment of Ms. Fowler, that was motivated in whole or in part, because of her race/color and/or race/color plus sex.

109.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of 42 U.S.C. § 1981, Ms. Fowler has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering; as well as damage to professional reputation and development, loss of income and other economic damages and benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

110.     Defendants' unlawful and discriminatory conduct in violation of 42 U.S.C. §1981 was outrageous and malicious, was intended to injure Ms. Fowler, and was done with conscious or reckless disregard of her civil rights, entitling Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

**COUNT II**
**RETALIATION/REPRISAL**
**42 U.S.C. § 1981**
**(All Defendants)**

111.     Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

112.     Defendants have retaliated against Ms. Fowler in violation of 42 U.S.C. §1981 for opposing and/or complaining of Defendants discriminatory practices against herself and/or other workers at 1722 I Street.  The distinct, intentional and tangible acts of retaliation include, but are not limited to, subjecting Ms. Fowler to further acts of discrimination, harassment, humiliation and disparate treatment; interfering, demanding and coercing Frontline to transfer her to an overnight shift at another building; making false and slanderous allegations against her which purposely interfered with her contractual relationship with Frontline; and/or interfering, demanding and coercing Frontline to transfer her from the building at 1722 I Street; and refusing any and all attempts to have her reinstated as a contract security guard at 1722 I Street.

113.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of 42 U.S.C. § 1981, Ms. Fowler has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering; as well as damage to professional reputation and development, loss of income and other economic damages and benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

114.     Defendants' unlawful and retaliatory conduct in violation of 42 U.S.C. §1981 was outrageous and malicious, was intended to injure Ms. Fowler, and was done with conscious or reckless disregard of her civil rights, entitling Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

## COUNT III

### DISCRIMINATION AND HARASSMENT
### THIRD PARTY INTERFERENCE- TITLE VII
### (Willco/Greehoot)

115.    Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

116.    At all relevant times during this Lawsuit, Frontline was a federal contractor whom was contractually bound to provide FPS contract security officers, including Ms. Fowler, at 1722 I Street, a building that was owned, controlled and/or managed by the Willco/Greenhoot entities.

117.    At all times relevant to this Lawsuit, both Willco and Greenhoot were employers subject to Title VII.  Mr. Pheasant, in particular, who worked for Willco/Greenhoot, was their main employee in charge of the building at 1722 I Street, and exerted *de facto* control over the terms, conditions and employment of FPS contract officers, including Ms. Fowler, and held himself out in a *de facto* supervisory capacity over such employees consistent with the many allegations in this Complaint.

118.    Defendants Willco/Greenhoot, as third parties, therefore unlawfully interfered with Ms. Fowler's employment at Frontline by permitting the Chief Engineer at the 1722 I Street building to create and foster a hostile working environment and/or *quid pro quo* harassment that included, among other things, severe and pervasive harassment of Ms. Fowler that was motivated in whole or in part because of her sex/gender; and by accepting, ratifying and/or otherwise failing to prevent or to remedy the environment.

119.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Ms. Fowler has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and

18

suffering; as well as damage to professional reputation and development, loss of income and other economic damages and benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

120.     Defendant's unlawful and discriminatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Ms. Fowler, and was done with conscious or reckless disregard of her civil rights, entitling Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

## COUNT IV

## RETALIATION/REPRISAL
### THIRD PARTY INTERFERENCE- TITLE VII
### (Willco/Greehoot)

121.     Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

122.     At all relevant times during this Lawsuit, Frontline was a federal contractor whom was contractually bound to provide FPS contract security officers, including Ms. Fowler, at 1722 I Street, a building that was owned, controlled and/or managed by the Willco/Greenhoot entities.

123.     At all times relevant to this Lawsuit, both Willco and Greenhoot were employers subject to Title VII.  Mr. Pheasant, in particular, who worked for Willco/Greenhoot, was their main employee in charge of the building at 1722 I Street, and exercised *de facto* control over the terms, conditions and employment of FPS contract officers, including Ms. Fowler, and held himself out in a *de facto* supervisory capacity over such employees consistent with the many allegations in this Complaint.

124.      Defendants Willco/Greenhoot, as third parties, therefore unlawfully retaliated against Ms. Fowler for opposing and/or complaining of Defendants discriminatory practices against herself and/or other workers at 1722 I Street.  The distinct, intentional and tangible acts

of retaliation include, but are not limited to, subjecting Ms. Fowler to further acts of discrimination, harassment, humiliation and disparate treatment; interfering, demanding and coercing Frontline to transfer her to an overnight shift; making false and slanderous allegations against her which purposely interfered with her contractual relationship with Frontline; and/or interfering, demanding and coercing Frontline to transfer her from the building at 1722 I Street; and refusing any and all attempts to have her reinstated as a contract security guard at 1722 I Street.

125.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Ms. Fowler has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering; as well as damage to professional reputation and development, loss of income and other economic damages and benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

126.    Defendant's unlawful and retaliatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Ms. Fowler, and was done with conscious or reckless disregard of her civil rights, entitling Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

## COUNT V
## HOSTILE WORKING ENVIRONMENT- SEXUAL HARASSMENT
## THIRD PARTY INTERFERENCE- D.C. HUMAN RIGHTS ACT
### (Willco/Greenhoot)

127.    Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

20

128.     At all relevant times during this Lawsuit, Frontline was a federal contractor whom was contractually bound to provide FPS contract security officers, including Ms. Fowler, at 1722 I Street, a building that was owned, controlled and/or managed by the Willco/Greenhoot entities.

129.     At all times relevant to this Lawsuit, both Willco and Greenhoot were employers subject to the DCHRA.  Mr. Pheasant, in particular, who worked for Willco/Greenhoot, was their main employee in charge of the building at 1722 I Street, and had *de facto* control over the terms, conditions and employment of FPS contract officers, including Ms. Fowler, and held himself out in a *de facto* supervisory capacity over such employees consistent with the many allegations in this Complaint.

130.     Defendants Willco/Greenhoot, as third parties, therefore unlawfully interfered with Ms. Fowler's employment at Frontline by permitting the Chief Engineer at the 1722 I Street building to create and foster a hostile working environment and/or *quid pro quo* harassment that included, among other things, severe and pervasive harassment of Ms. Fowler that was motivated in whole or in part because of her sex/gender; and by accepting, ratifying and/or otherwise failing to prevent or to remedy the environment.

131.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the DCHRA, Ms. Fowler has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering; as well as damage to professional reputation and development, loss of income and other economic damages and benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

132.     Defendant's unlawful and discriminatory conduct in violation of the DCHRA was outrageous and malicious, was intended to injure Ms. Fowler, and was done with conscious or

reckless disregard of her civil rights, entitling Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

**COUNT VI**
**RACE DISCRIMINATION**
**THIRD PARTY INTERFERENCE- D.C. HUMAN RIGHTS ACT**
**(Willco/Greenhoot)**

133.    Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

134.    Defendants violated the DCHRA by discriminating against Ms. Fowler on the basis of her race/color (African American/Black) by taking actions that had the effect of interfering, performing and enjoying all benefits, privileges, terms and conditions of her contractual relationship with Frontline, and specifically denying her the opportunity to work and perform in a building environment at 1772 I Street that was free of unlawful harassment.

135.    Defendants have discriminated against Ms. Fowler on the basis of her race/color in violation of the DCHRA by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment and/or *quid pro quo harassment* that included, among other things, severe and pervasive harassment of Ms. Fowler, that was motivated in whole or in part, because of her race/color and/or race/color plus sex.

136.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the DCHRA, Ms. Fowler has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering; as well as damage to professional reputation and development, loss of income and other economic damages and benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

137.     Defendants' unlawful and discriminatory conduct in violation of the DCHRA was outrageous and malicious, was intended to injure Ms. Fowler, and was done with conscious or reckless disregard of her civil rights, entitling Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

## COUNT VII
## RETALIATION/ REPRISAL
## THIRD PARTY INTERFERENCE- D.C. HUMAN RIGHTS ACT
### (Willco/Greenhoot)

138.     Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

139.     At all relevant times during this Lawsuit, Frontline was a federal contractor whom was contractually bound to provide FPS contract security officers, including Ms. Fowler, at 1722 I Street, a building that was owned, controlled and/or managed by the Willco/Greenhoot entities.

140.     At all times relevant to this Lawsuit, both Willco and Greenhoot were employers subject to the DCHRA.  Mr. Pheasant, in particular, whom worked for Willco/Greenhoot, was their main employee in charge of the building at 1722 I Street, and had *de facto* control over the terms, conditions and employment of FPS contract officers, including Ms. Fowler, and held himself out in a *de facto* supervisory capacity over such employees consistent with the many allegations in this Complaint.

141.      Defendants Willco/Greenhoot, as third parties, therefore unlawfully retaliated against Ms. Fowler for opposing and/or complaining of Defendants discriminatory practices against her and other workers at 1722 I Street.  The distinct, intentional and tangible acts of retaliation include, but are not limited to, subjecting Ms. Fowler to further acts of discrimination, harassment, humiliation and disparate treatment; interfering, demanding and coercing Frontline to transfer her to an overnight shift; making false and slanderous allegations against her which

purposely interfered with her contractual relationship with Frontline; and/or interfering, demanding and coercing Frontline to transfer her from the building at 1722 I Street; and refusing any and all attempts to have her reinstated as a contract security guard at 1722 I Street.

142.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the DCHRA, Ms. Fowler has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering; as well as damage to professional reputation and development, loss of income and other economic damages and benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

143.     Defendant's unlawful and retaliatory conduct in violation of the DCHRA was outrageous and malicious, was intended to injure Ms. Fowler, and was done with conscious or reckless disregard of her civil rights, entitling Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

### COUNT VIII
### AIDING AND ABETTING DISCRIMINATION AND RETALIATION
### D.C. HUMAN RIGHTS ACT
### (Mr. Pheasant)

144.     Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

145.     From early 2014 through November of 2014, Defendant Donald Pheasant aided, abetted, invited, compelled, and coerced discriminatory or retaliatory conduct against Ms. Fowler in violation of the DCHRA.

146.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the DCHRA, Ms. Fowler has suffered and continues to suffer severe mental

anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering; as well as damage to professional reputation and development, loss of income and other economic damages and benefits, justifying an award of compensatory damages in an amount to be determined by a jury at trial.

147.     Defendant's unlawful and retaliatory conduct in violation of the DCHRA was outrageous and malicious, was intended to injure Ms. Fowler, and was done with conscious or reckless disregard of her civil rights, entitling Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

<u>**COUNT IX**</u>

<u>**TORTIOUS INTERFERENCE**</u>
**DISTRICT OF COLUMBIA COMMON LAW**
**(Mr. Pheasant)**

148     Ms. Fowler repeats and incorporates by reference the allegations of all paragraphs of this Complaint as if they were more fully set forth in full.

149.     At all relevant times during this Lawsuit, Ms. Fowler had a business relationship with Frontline to serve as a FPS contractor officer at 1722 I Street.  As Chief Engineer of this building and an individual with knowledge of the security requirements of FPS, contract with Frontline and Ms. Fowler personally, Mr. Pheasant had knowledge of this relationship.

150.     Mr. Pheasant intentionally interfered with Ms. Fowler's relationship with Frontline by subjecting her to a harassing and hostile work environment and/or *quid pro quo harassment,* in addition to retaliating, demanding and coercing Frontline to transfer her to an overnight shift and over to another building; making false and slanderous allegations against her which purposely interfered with her contractual relationship with Frontline; and/or interfering,

demanding,  and coercing Frontline to transfer her from the building at 1722 I Street; and

refusing any and all attempts to have her reinstated as a contract security guard at 1722 I Street.

151.    As a direct and proximate result of Mr. Pheasant's unlawful actions, Ms. Fowler

has suffered and continues to suffer severe mental anguish and emotional distress, including but

not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and

self-confidence, emotional pain and suffering; as well as damage to professional reputation and

development, loss of income and other economic damages and benefits, justifying an award of

compensatory damages in an amount to be determined by a jury at trial.

152.    Mr. Pheasant's unlawful actions was outrageous and malicious, and was intended

to injure Ms. Fowler, and was done with conscious or reckless disregard of her rights, entitling

Ms. Fowler to an award of punitive damages in an amount to be determined at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, on

each applicable Count of the Complaint and award the following relief:

A.  A judicial declaration that the acts and practices complained of herein are in violation of the 42 U.S.C. § 1981, Title VII and the DCHRA;

B.  Back pay, front pay, and other loss of income and benefits in the amount of $250,000 dollars;

C.  Compensatory damages;

D.  Punitive damages;

E.  Pre and post-judgment interest;

F.  Reasonable attorney's fees and costs;

G.  And such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may require.

## DEMAND FOR TRIAL BY JURY

Ms. Fowler demands a trial by jury in this action.

Respectfully submitted,

CHARLAYNE FOWLER

/s/

_____

Timothy W. Romberger
D.C. Bar No. 458225
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20046
(202) 248-5053
timromberger1@comcast.net

Date:  November 18, 2015__